RECEIVED

APR 1 2 2013 *кб*

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

GERITES CORMIER, III                    CIVIL ACTION NO.: 10-1089

VERSUS                                  JUDGE DOHERTY

W. & T. OFFSHORE, INC., ET AL.          MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Pending before this Court is the Motion for Summary Judgment [Doc. 64] filed by defendant W&T Offshore, Inc. ("W&T"). Plaintiff Gerites Cormier, III opposes the motion [Doc. 66], as does defendant Blake International USA Rigs, Inc. ("Blake") and Lexington Insurance Company ("Lexington") [Doc. 67]. W&T filed a Motion for Leave to File Reply Brief [Doc. 70], which was granted by this Court [Doc. 72], and plaintiff filed a Motion for Leave to File Sur-Reply Brief [Doc. 71], which was also granted [Doc. 74].

In its motion, W&T seeks dismissal of the plaintiff's Complaint and First Supplemental and Amending Complaint, as well as the Complaint of Intervention of the intervenor, Liberty Mutual Insurance Company ("Liberty Mutual"), "with prejudice as regards W&T," on grounds Mr. Cormier's employer, Offshore Energy Services, Inc. ("OES"), and co-defendant Blake were W&T's independent contractors at all relevant times; W&T did not retain or exercise operational control over the work performed by Blake and OES; and W&T was not independently negligent in causing or contributing to the injuries alleged by Mr. Cormier. W&T argues it has no liability to Mr. Cormier and is entitled to dismissal with prejudice of Mr. Cormier's and Liberty Mutual's complaints.

All briefing is now before the Court, and the motion is ripe for consideration.

## I.    Factual and Procedural Background

The following facts are undisputed:

- Plaintiff, Gerites Cormier, III (Mr. Cormier), was a Tong Operator who claims to have been injured on July 19, 2009 during a casing operation conducted by his employer, Offshore Energy Services (OES), and Blake International USA Rigs, Inc. (Blake) on the Blake 1502 drilling rig, which was drilling an oil and gas well (A-6 well) on the ST 316-A platform.

- W&T Offshore, Inc. (W&T) is the owner of the ST 316-A platform. The ST 316-A platform is fixed upon the Outer Continental Shelf in South Timbalier block 316 of the Gulf of Mexico, off the coast of Louisiana.

- The A-6 well was designed by W&T's engineers. The design was implemented through W&T's well plan, which called for various casing strings to be installed into the well, including a 4,300' string of 13 3/8" casing.

- W&T contracted with Blake to provide the Blake 1502 and the supervision, equipment, and personnel necessary to drill the A-6 well in accordance with the well plan, which was provided to Blake by W&T.

- Blake performed its work on the A-6 well pursuant to an Offshore Daywork Drilling Contract (Drilling Contract) between W&T and Blake.

- Blake was responsible for supplying and utilizing its personnel, its Blake 1502 drilling rig (a self-contained rig that is installed on an oil company's platform to drill wells), and its equipment to drill the A-6 well and to implement W&T's well plan. Blake's responsibilities included drilling the well, moving casing joints into position for connection into casing strings, and lowering casing strings into the A-6 well for installation.

- Blake holds itself out as a company with expertise in drilling wells, including the installation of casing strings.

- To run a casing string into a well, it is necessary that the casing joints that comprise the casing string be screwed together to create the string. W&T contracted with OES to provide the personnel, equipment, and supervision to screw the casing joints together and into the casing string. OES also was responsible for installing "down hole" equipment and tools into the casing string.

- At all relevant times, the relationship between W&T and OES was governed by the Master Service Contract between W&T and OES.

- OES holds itself out as a company with expertise in conducting casing operations.

- OES did not look to W&T or W&T's personnel to tell OES or OES's personnel how to perform its casing work.

- W&T contracted with Eagle Consulting, LLC to provide a drilling consultant, Mark Lewis, in connection with the drilling of the A-6 well.

- On July 17, 2009, Blake had drilled the A-6 well to a sufficient depth so that 4,300' of 13 3/8" diameter casing could be installed into the well in accordance with the well plan.

- On July 17, 2009, OES personnel, including Mr. Cormier, arrived on the Blake 1502 and began performing OES's role in installing the 13 3/8" casing into the A-6 well.

- Blake and OES personnel worked together to install the casing string into the A-6 well. Blake used its equipment to put the first casing joint into position in OES's flush mount spider slips, which are used to hold the casing string in the proper position during installation. Blake moved the next casing joint into position for connection to the casing string. OES secured the casing joints into the casing string by screwing them together with its specialty equipment (i.e., power tongs). Once the casing joint was secured into the casing string, Blake personnel and equipment lowered the casing string through the rotary and into the well so that the next casing joint could be installed.

- Mr. Cormier, as a Tong Operator for OES, was responsible for tightening the casing joints into the casing string with OES's power tongs – a hydraulic wrench device used to screw a casing joint into a casing string. Mr. Cormier also was responsible for making up and installing tools, such as inflatable packers, into the casing string with OES's power tongs.

- In the early morning hours of July 19, 2009, Blake and OES were installing the 13 3/8" diameter casing into the A-6 well.

- After installing multiple casing joints into the casing string, Blake and OES reached a point in the casing string at which a Weatherford inflatable packer – a "down hole" tool – needed to be installed into the casing string in accordance with the well plan.

- It is common for tools or packers, like the Weatherford inflatable packer in this case, to be installed into casing strings being installed into oil and gas wells.

- Mr. Cormier screwed and tightened the Weatherford inflatable packer into the casing string just like a casing joint. The outside diameter and circumference of the Weatherford inflatable packer was greater than the outside diameter and circumference of the casing joints, which is common with inflatable packers.

- Because the diameter and circumference of the Weatherford inflatable packer was greater than that of the casing joints, the Weatherford inflatable packer could not pass through OES's flush mount spider slips. OES removed the flush mount spider slips temporarily to allow Blake to lower the Weatherford inflatable packer and the casing string through the rotary on the rig floor and down into the A-6 well.

- The removal of the flush mount spider slips so tools like inflatable packers can be lowered into well was an exercise routinely performed by Blake's and OES's crews.

- After the Weatherford inflatable packer was lowered through the rotary, OES and Blake needed to reinstall the flush mount spider slips so the casing installation could continue.  However, the casing string had to be repositioned so the flush mount spider slips could be reinstalled.

- It is common for a casing string to have to be repositioned in order reinstall flush mount spider slips.

- It was part of Blake's job to reposition the casing string so that the flush mount spider slips could be reinstalled. This had to be done so that additional casing could be installed into the A-6 well. Blake did not look to W&T to determine how to re-position the casing string. This was part of the work Blake was hired to perform.

- The OES foreman/supervisor (James Bert Comeaux) and the Blake toolpusher/supervisor (Alex Cheramie) met on the floor of the Blake 1502 to discuss the best way to reposition the casing string so the flush mount spider slips could be reinstalled.

- Blake's toolpusher/supervisor directed Blake personnel to retrieve a nylon strap owned by Blake, to wrap the strap around the casing string, and to hook the strap up to the Blake 1502's tong pull line so the casing string could repositioned by pulling it over with the tong pull line.

- Following the Blake toolpusher/supervisor's instructions, Blake personnel retrieved a 2" nylon strap, rated to withstand a maximum force of approximately 12,500 lbs., to pull and reposition the casing string. The strap was wrapped around the casing string and connected to the tong pull line with a shackle.

- The Blake 1502's tong pull line, to which the 2" nylon strap was shackled, could be

-4-

pulled with a force of up to 15,000 lbs. Blake's equipment was set up such that the tong pull line could pull with more force than the 2" nylon strap was rated to withstand.

- Blake had other straps, including 3" straps, and strap configurations, such as double strapping, at its disposal that could have been used. The other straps and strap configurations could withstand more force than the tong pull line could apply.

- Blake's assistant driller, at the direction of Blake's toolpusher, pulled on the tong pull line and the 2" nylon strap to reposition the casing string.

- As Blake's assistant driller pulled the Blake 1502's tong pull line and the 2" nylon strap, OES personnel, including Mr. Cormier, attempted to reinstall the flush mount spider slips.

- While OES personnel attempted to reinstall the flush mount spider slips, the 2" nylon strap popped/broke.  Mr. Cormier alleges he was injured when the nylon strap broke and struck him in the right arm.

- Blake's toolpusher/supervisor knew before Mr. Cormier's accident that the 2" nylon strap which failed was rated to withstand only up to approximately 12,500 lbs of force and that the tong pull line on the Blake 1502 could be pulled with a force of up to approximately 15,000 lbs. Nevertheless, he chose to proceed with the 2" nylon strap, without a gauge, even though straps and cables that were sufficiently rated to, and alternative configurations of strap(s) or cable(s) that would, withstand the maximum force of the tong pull line were available.

- Mr. Cormier's accident would not have occurred if a strap, cable, chain or configuration of strap(s), cable(s) or chain(s) that could withstand the maximum force applied by the tong pull line were used.

- The removal and reinstallation of flush mount spider slips was an exercise routinely performed by Blake's and OES's crews.

- At all relevant times, Mr. Cormier was supervised exclusively by OES personnel. At no time did W&T personnel supervise or instruct Cormier regarding the work Cormier was performing on the Blake 1502.

On July 6, 2010, Mr. Cormier filed suit against W&T and Blake.  In his original complaint, Mr. Cormier alleges his accident and resulting injuries occurred as the result of the following non-exclusive acts and/or omissions on the part of W&T and Blake:

1.    Failure to exercise reasonable care for the safety of all persons involved in the casing operation, including Complainant;

2.    Creation of and failure to eliminate hazardous and/or unsafe conditions;

3.    Negligent operation of the platform on South Timbalier 316, its equipment and/or appurtenances at the time of this accident by defendants' agents, employees and/or representatives;

4.    Failure to adequately train and/or supervise defendants' employees, crews, and/or third parties who were supervising the operation and performance of casing work at the time of the injury to Complainant;

5.    Using inadequate and defective equipment, and/or using equipment that was not designed and/or intended to be used in connection with the work being performed at the time of Complainant's injury at the direction of defendants' agents, employees, and/or representatives;

6.    Failure to properly supervise platform operations and/or work assignments by supervisors and/or third parties supervising the work being performed at the time of Complainant GERITES CORMIER, III's injury; and

7.    Failure to do that which should have been done so as to avoid the accident in question.[1]

On July 29, 2010, Mr. Cormier filed a Supplemental and Amending Complaint [Doc. 9] in order to correctly name as a defendant Blake International USA Rigs, Inc. and add Lexington Insurance Company, the liability insurer of Blake, as a defendant.  On December 10, 2012, Liberty Mutual, OES's workers compensation insurer, filed a complaint of intervention against Blake and W&T, arguing it has paid disability benefits to and medical expenses for Mr. Cormier, and seeking reimbursement of such benefits and payments.[2]  All complaints have been answered.

W&T filed the instant motion for summary judgment arguing application of the independent

---

[1] *See* Complaint, Doc. 1, at ¶6.

[2] *See* Complaint of Intervention, Doc. 57.

contractor defense, which Mr. Cormier opposes.  Although Blake and Lexington have not filed cross-claims against W&T, the crux of W&T's motion for summary judgment is that both OES (Mr. Cormier's employer), and co-defendant Blake were W&T's independent contractors, and that W&T did not exert operational control over *either* entity, such that W&T can have no liability for Mr. Cormier's injuries.  Because W&T's motion argues application of the independent contractor defense *vis-a-vis* Blake, Blake and Lexington have also filed an opposition brief to W&T's motion.[3]

In connection with the assertion of the independent contractor defense by W&T, the following arguments have been made by the parties.  W&T argues it exerted no operational control over the work of either of its independent contractors, OES and Blake, and therefore cannot be liable for Mr. Cormier's injuries.  W&T argues the role of Mark Lewis – W&T's representative on the rig (the "company man") – was to monitor the implementation of W&T's well plan and to coordinate the logistics of getting necessary equipment, personnel, supplies, and specialty contractors on location as needed for the drilling of the A-6 well.  W&T argues Mr. Lewis monitored drilling activities to confirm that W&T's well plan for the A-6 well was being executed by W&T's independent contractors, but did not instruct OES or Blake in the details of the work they performed for W&T.  Thus, generally speaking, W&T argues Mr. Lewis did not direct or order Blake or OES personnel in the details of their execution of the well plan, including the drilling and casing installation work they were performing at the time of Mr. Cormier's accident, and did not direct or order Blake or OES in the details of how they should execute the well plan, including the installation of casing.  W&T avers Blake and OES were entirely free to perform their work in their own way, and W&T did not retain or exercise operational control, by contract or otherwise, over the work

---

[3] For ease of reference, this Court will refer to Blake and Lexington collectively hereinafter as "Blake."

performed by Blake or OES.

With respect to the specific accident that led to the plaintiff's alleged injuries, W&T asserts Mr. Lewis did not participate in the meeting between the Blake and OES personnel concerning the repositioning of the casing string and the reinstallation of the flush mount spider slips that occurred immediately prior to Mr. Cormier's alleged accident, and if Mr. Lewis was present on the drill floor while the meeting was conducted, all he did was listen to what Blake and OES said. Specifically, W&T asserts Mr. Lewis did not give any instructions or orders to Blake or OES concerning the actions that could or should be taken to re-position the casing string or to reinstall the flush mount spider slips. Thus, W&T argues Mr. Lewis did not direct Blake or OES to use the strap that caused the injuries allegedly suffered by Mr. Cormier, nor did W&T give any express or implied orders to Blake or OES to engage in any unsafe work practice that led to the alleged injuries which form the basis of this lawsuit.

Both Mr. Cormier and Blake dispute the foregoing, arguing multiple witnesses have testified by deposition that Mr. Lewis was present on the rig floor at the time of the accident and participated in the discussions that rook place on the rig floor prior to the accident at issue regarding the best manner in which to pull the casing string back to center. Mr. Cormier and Blake also argue the contractual language offered by W&T as evidence that it did *not* retain operational control over the operations of OES and Blake is not as strongly in favor of the position espoused by W&T as in other cases.

Thus, the crux of the instant motion is whether and to what extent W&T exercised operational control over the activities of OES and Blake, or expressly or impliedly authorized an unsafe work practice.

## II.      Law and Analysis

### A.      Summary Judgment Standard

As an initial matter, this Court notes although it is this Court's usual practice to address ERISA cases on a trial-by-briefs basis – as the evidence that is considered by the Court is typically limited to the administrative record only – it is, nevertheless, at times, also appropriate to consider the issues in an ERISA case on a summary judgment basis. In such cases, the usual summary judgment rules control. *See, e.g., Barhan v. Ry-Ron, Inc.*, 121 F.3d 198, 202-03 (5th Cir. 1997) (summary judgment is an appropriate procedural vehicle for the administrator to use in obtaining a resolution of the plan beneficiary's suit; once the motion for summary judgment is filed, the usual summary judgment rules control).

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. Proc. 56(a).   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Proc. 56(c). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

court may give an opportunity to properly support or address the fact; consider the fact undisputed for purposes of the motion; grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or issue any other appropriate order.  Fed. R. Civ. Proc. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

This Court notes, effective December 1, 2010, Rule 56 was amended.  The amended Rule 56 contains no substantive change to the summary judgment standard.  Summary judgment remains appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This Court must view all evidence in a light most favorable to the non-movant.  *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007).  However, in arguing that a genuine issue of material fact exists that precludes summary judgment, the non-movant must identify specific evidence in the record to support its position.  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994).  The non-movant cannot preclude summary judgment by raising "some metaphysical doubt as to the material facts, conclusory

allegations, unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*) (internal citations and quotation marks omitted).

The Supreme Court has stated:

> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little*, 37 F.3d at 1075.

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.*  To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is

not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### B.      Application of Louisiana Law

W&T argues – and neither Mr. Cormier nor Blake disputes – the issue before the Court is governed by Louisiana law by way of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §1331, et seq., which provides this Court's jurisdictional basis.   Under OCSLA, the law of the adjacent state applies as surrogate federal law to the extent the law of the adjacent state is not inconsistent with other federal laws and regulations.   43 U.S.C. 1333(a)(2)(A); *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969); *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 328 (5th Cir. 1987).   W&T argues its ST 316-A platform is an OCS platform, offshore Louisiana, and Louisiana law applies as surrogate federal law.   No party disputes this fact.

### C.      Independent Contractor Defense

As an initial matter, Mr. Cormier does not contest that at the time of the accident, both Blake and OES were independent contractors of W&T pursuant to contracts between W&T and Blake and W&T and OES.[4]   Under Louisiana law, "a principal generally is not liable for the offenses an

---

[4] The Offshore Daywork Drilling Contract ("Drilling Contract") between W&T and Blake confirms an independent contractor relationship:

106.   Contractor's Status

Contractor [Blake] shall be an independent contractor in performing its obligations hereunder.

*See* Drilling Contract, attached as Exhibit "E" to W&T's motion for summary judgment, Doc. 64, at ¶106 (emphasis added).

The Master Service Contract ("MSC") between W&T and OES also confirms an independent contractor relationship:

independent contractor commits in the course of performing its contractual duties." *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 549 (5th Cir. 1987), *cert. denied*, 485 U.S. 1034 (1988). However, the independent contractor defense is subject to two exceptions. First, a principal may not avoid liability for injuries resulting from ultrahazardous activities performed by its contractors on behalf of the principal. *Roberts*, 266 F.3d at 380; *Ainsworth*, 829 F.2d at 549; *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997). Second, a principal may not avoid liability if it retains operational control over its contractors' negligent acts or expressly or impliedly authorizes its contractors' negligent acts. *Roberts*, 266 F.3d at 380; *Coulter*, 117 F.3d at 912.

Mr. Cormier concedes the first exception is inapplicable in this case, acknowledging under the "relevant tests established by the United States Fifth Circuit Court of Appeal, the casing operations being conducted by Blake and OES at the time of the accident involving [the plaintiff] were not ultrahazardous activities."[5] Thus, the first exception is not at issue.

However, Mr. Cormier argues application of the second exception, which imposes liability upon a principal for the negligent acts of an independent contractor when the principal retains or exercises operational control over its independent contractor or expressly or impliedly authorizes negligent acts. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1997). In *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997), the Fifth Circuit stated that "[t]esting for this

---

3.     INDEPENDENT CONTRACTOR

3.1          It is expressly understood and agreed that contractor [OES] is an independent contractor and that neither Contractor nor Contractor's principals, partners, employees or subcontractors are servants, agents or employees of W&T.

*See* MSC, attached as Exhibit "F" to W&T's motion for summary judgment, Doc. 64, at ¶3 (emphasis added).

[5] *See* plaintiff's opposition brief, Doc. 66, at p. 7.

operational control exception first requires an examination of whether and to what extent the right to control work has been contractually reserved by the principal."  In connection with the Court's examination of this factor, the parties have provided the Court with the relevant W&T-Baker and W&T-OES drilling contracts.

### 1.    OES

The MSC between W&T and OES states the following:

3.    INDEPENDENT CONTRACTOR

3.1          It is expressly understood and agreed that contractor [OES] is an independent contractor and that neither Contractor nor Contractor's principals, partners, employees or subcontractors are servants, agents or employees of W&T.[6]

***

As an independent contractor, Contractor agrees to comply with all laws, rules and regulations, whether federal, state or municipal, which now or in the future may be applicable to all Work performed hereunder or applicable to Contractor's business, equipment or employees engaged in, or in any manner connected with, its performance hereunder.

2. WORK TO BE PERFORMED

***

Contractor will commence performance on such date and at such time as is agreed upon between Contractor and W&T and, once having commenced any such Work, Contractor will perform all such Work in a good, prudent and workmanlike manner in accordance with this Contract and the Order (as hereinafter defined).[7]

James Bert Comeaux, OES's foreman/supervisor on the date of Mr. Cormier's accident,

---

[6] *See* MSC, attached as Exhibit "F" to W&T's motion for summary judgment, Doc. 64, at ¶3 (emphasis added)

[7] *Id.* at ¶2.

testified as follows regarding operational control of OES's work by W&T:

> Q:     What OES does and what you've done for these 20 years, the work that you-all have done is the part of the drilling a well that involves running casing into the hole?
>
> A:     Yes. Running casing into the hole.
>
> Q:     And when you're running the casing in the hole on a job, you-all, the OES crew goes to a drilling rig location?
>
> A:     Yes, sir.
>
> Q:     And work with the drilling rig crew?
>
> A:     Yes, sir.
>
> ***
>
> Q:     OES – when OES contracts with an oil company to run casing, they indicate to the oil company that they know what they're doing in running casing?
>
> A:     Yes, sir.
>
> Q:     They're not looking at the oil company to tell them how to go about running the casing?
>
> A:     No, sir.[8]

### 2.     Blake

The Drilling Contract between W&T and Blake states:

106.  Contractor's Status

> Contractor shall be an independent contractor in performing its obligations hereunder.

***

403.  Maintain and Repair Equipment

---

[8] *See* Deposition of James Bert Comeaux, attached as Exhibit "B" to W&T's motion for summary judgment, Doc. 64, at p. 11, l.5-18; p. 13, l. 2-10 (emphasis added).

Contractor shall, subject to paragraph 901, <u>be responsible for the maintenance and repair of all Contractor's Items and shall provide all spare parts and materials required therefore.</u>

***

501.  <u>Contractor's Standard of Performance</u>

Contractor shall carry out all operations hereunder on a daywork basis.  For purposes hereof the term "daywork" means <u>Contractor shall furnish equipment, labor, and perform services as herein provided, as an independent contractor,</u> for a specified sum per day as requested by Operator (or any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations).  When operating on a daywork basis, Contractor shall be paid at the applicable rates of payment.....[9]

502.  <u>Operation of Drilling Unit</u>

Subject to Paragraph 605, <u>Contractor shall be responsible for the operation of the Drilling Unit, including, supervising moving operations and positioning on drilling locations as required by Operator.</u>  Operations under this Contract will be performed on a twenty-four (24) hour per day basis.

503.  <u>Compliance with Operator's Instructions</u>

Contractor shall comply with all requests of Operator consistent with the provisions of this Contract, including, without limitation, drilling, well control and safety instructions.....[10]

Thus, in the instant case, Baker was responsible for the number, selection, replacement, hours of labor, and remunerations of its personnel; "provid[ing] [its] Items and Personnel and perform[ing] the services to be performed;" maintaining adequate stock levels of its Items and replenishing if necessary;" maintenance and repair of its own equipment; *operation of the Drilling Unit, including supervising moving operations and positioning on drilling locations*; and complying with the

---

[9] *See* Offshore Daywork Drilling Contract between W&T and Blake, attached as Exhibit "E" to W&T's motion for summary judgment [Doc. 64] (emphasis added).

[10] *Id.*

requests of W&T consistent with the provisions of the Drilling Contract, including drilling, well control and safety instructions.

Alex Cheramie, Blake's toolpusher/supervisor on the date of Mr. Cormier's accident, testified as follows regarding operational control of Baker's work by W&T:

> Q:   If casing needs to be centered, gets out of – is not centered while being run in the hole, is it part of Blake's job to recenter it?
>
> A:   Yeah.
>
> Q:   I mean that's what W&T, that's part of the work that W&T is hiring you to perform?
>
> A:   Right, yes.
>
> Q:   <u>You're not looking to a W&T representative, a company man to tell you how to center the pipe</u>?
>
> A:   <u>No</u>.
>
> Q:   <u>That's why he's got y'all</u>?
>
> A:   <u>Right, yeah</u>.[11]

### 3.   Operational Control

In its motion, W&T argues the language in the W&T-OES MSC and the W&T-Baker Drilling Contract shows both OES and Baker were independent contractors responsible for, and in total control over, the work they were performing at the time of Mr. Cormier's accident.

When the contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control.  *See Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003), *citing Coulter*, 117 F.3d at 912.  In *Landry v. Huthnance Drilling Co.*,

---

[11] *See* Deposition of Alex Cheramie, attached as Exhibit D to W&T's motion for summary judgment, Doc. 654, at p. 24, l. 1-5 (emphasis added).

889 F.2d 1469, 1471 (5th Cir. 1989), the court stated:

> [i]n order for [a principal] to be liable for the actions of an [independent contractor], the [principal] must have retained at least some degree of control over the manner in which the work was done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.

(quoting RESTATEMENT (SECOND) OF TORTS § 414, comment c).

In response, Mr. Cormier and Baker argue the language in the contracts is not as clear regarding operational control as the language in other contracts in other cases, for example, *Hebert v. CXY Energy, Inc.*, 72 F.Supp.2d 681, 683 (W.D. La. 1999) (J. Doherty), in which the drilling contract stated that the contractor was an independent contractor, "free of control and supervision by [operator] as to the means or manner of performing all work or services hereunder." Mr. Cormier and Blake contend that, unlike the contract at issue in *Hebert*, the Drilling Contract between W&T and Blake did not leave Blake entirely free to do the work in its own way.[12] Mr. Cormier and Baker point to the actual control they allege W&T's company man, Mark Lewis, retained at the time of the accident, referring to certain statements Mr. Lewis made after Mr. Cormier's accident,[13] as well as

---

[12] Plaintiff and Blake also point to the language in the drilling contract requiring Blake to comply with W&T's safety instructions as an example of one of the ways in which W&T retained control over operations. However, the Fifth Circuit has determined that despite an agreement between the contractor and the principal requiring the contractor to abide by the principal's safety regulations, the principal does not retain operational control. *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 269 (5th Cir.1992).

[13] Mr. Lewis testified at his deposition as follows:

> A: After-after it broke, I did specifically say, "We will not do that again."
> Q: Okay.
> A: And I told, I think it was the driller on [sic] the night pusher, I don't recollect, but I told him to go get the cable to put around the casing.
> Q: You remember them putting the cable around the casing?

the fact that Mr. Lewis had the power to stop any unsafe practices taking place on the rig.  As this Court stated in *Hebert*, for purposes of determining operational control, the relevant inquiry becomes whether W&T had actual control over the operation of the particular activity during which Mr. Cormier was injured.  72 F. Supp.2d at 687, *citing Robertson v. Arco Oil & Gas Co.*, 948 F.2d 132, 133 (5th Cir.1991).

In *Fruge*, the court explained:

> Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way.  *LeJeune v. Shell Oil Co.*, 950 F.2d 267-270 (5th Cir.1992); *McCormack v. Noble Drilling Corp.*, 608 F.2d 169, 175 n. 9 (5th Cir.1979). Here, Parker was exclusively responsible for controlling the details of the work it performed: the contract provided that Parker "shall be an independent contractor with respect to performance of all work hereunder. [Anadarko] shall have no direction or control of [Parker] or [Parker's] Personnel except in the results to be obtained." Contract § 105 (emphasis added).

> The summary judgment evidence shows Anadarko provided on-site supervision 24-hours per day, via various independent contractors whose employees reported to Anadarko staff engineers on a daily basis. The physical presence of a representative of a principal is not sufficient to show supervision or control. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550-51 (5th Cir.1987), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988), *Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir.1994). Periodic inspections by a principal's "company man" do not equate to that principal retaining control over the operations conducted by a drilling crew. *Ainsworth*, 829 F.2d at 550. "In short, absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal ... cannot be liable under the operational control exception." *Coulter*, 117 F.3d at 912.

> Summary judgment is appropriate because Plaintiff has failed to present facts sufficient to distinguish his case from *Coulter*. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment is appropriate unless plaintiff can present evidence to support each essential element of his claim). "This Court has consistently held on similar facts that a principal, such

---

A:    Yes.  We finished the job.

*See* Deposition of Mark Lewis, attached as Exhibit "C" to W&T's motion for summary judgment, at p. 37, l. 2-10.

as [Anadarko], who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors." *Wallace v. Oceaneering Int'l*, 727 F.2d 427, 437 (5th Cir.1984). On the evidence of record, summary judgment is proper for Anadarko as well as the employers of Anadarko's company men, Zielinski and Stokes & Spiehler, neither of whom are responsible for the alleged negligent acts of an independent contractor of their principal.

Here, the evidence shows both OES and Baker had direct supervision over the step-by-step process of accomplishing the work they were hired to do for W&T. Both the OES and Baker supervisors onboard the rig at the time of the accident have confirmed the foregoing in their deposition testimony. Furthermore, the actual working situation that was employed on the date of the accident is consistent with the directives contained in both contracts, that is, either Baker, acting alone, or Baker, acting in concert with OES, made the decision as to how the casing string would be re-centered, including which equipment would be used. The undisputed facts are that the re-centering of string is a common occurrence in the oilfield, and both Baker and OES were skilled at how to accomplish the task, which was one of the jobs they were hired by W&T to do as part of the drilling operations. Thus, OES and Baker were entirely free to do the work in their own way, and did so. The uncontroverted testimony shows Blake personnel made the decision to use a strap (rather than a chain), and Blake selected the particular strap that was used.[14]

That W&T monitored the drilling and casing work by having a drill consultant onsite does not mandate a conclusion that W&T retained control over casing operations:

> Moreover, the fact that a principal like Texaco reserves the right to monitor its contractor's performance and stations a "company man" on the platform who observes the contractor's activities, has the right to make safety recommendations to

---

[14] Blake claims it made the decision about the use of the strap with input from OES. W&T argues, and this Court agrees, it is immaterial to W&T's motion whether the action was directed by Blake alone or with input from OES.

> the contractor, and is obligated to report continuing unsafe work practices or conditions to his (Texaco) superiors, does not mean that the principal controls the methods or details of the contractor's work.

*Coulter*, 117 F.3d at 912.  Nor is the result different merely because W&T had a general right to order work stopped.  *See Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989) ("It is not enough that [the company man] has merely a general right to order the work stopped or resumed...").

Mr. Cormier and Blake attempt to create an issue of fact by arguing there is a dispute regarding the presence and level of participation of Mr. Lewis in a discussion on the rig floor immediately prior to the plaintiff's accident concerning whether to use a cable/chain or a nylon strap to attempt to re-center the casing string.  Both Mr. Cheramie (Blake's supervisor)[15] and Mr.

---

[15] Mr. Cheramie testified as follows:

| | |
|---|---|
| Q: | If casing needs to be centered, gets out of – is not centered while being run in the hole, it is part of Blake's job to recenter it? |
| A: | Yeah. |
| Q: | I mean that's what W&T, that's part of the work that W&T is hiring you to perform? |
| A: | Right, yes. |
| Q: | You're not looking to a W&T representative, a company man to tell you how to center the pipe? |
| A: | No. |
| Q: | That's why he's got y'all? |
| A: | Right, yeah. |

*** 

| | |
|---|---|
| Q: | Did he [(the company man)] tell anybody what to do? |
| A: | No, he did not. |
| Q: | Who made the decision about using the strap? |
| A: | I gave them the okay to put the strap. |

*** 

| | |
|---|---|
| Q: | Let me just be clear. The company man did not direct anybody to do anything? |
| A: | No. |
| Q: | From the time that you started, you know, go find the strap, use it, hook it up to the Hydrocat, do you know for a fact that the company man was on the drill floor? |

Comeaux[16] (OES's supervisor) testified Mr. Lewis was present during the discussion but acknowledges Mr. Lewis did not participate in giving any instructions. Mr. Lewis, however, testified that by the time he got to the rig floor, the decision to use the strap had been made and "everything

---

| | |
|---|---|
| A: | Yes, he was. |
| Q: | Was he by – do you know where he was? |
| A: | He was basically right to side of me (indicating). |
| Q: | He was to the side of you and behind you? |
| A: | Yes. |
| Q: | So whatever the instructions you were giving, he was to the side of you and behind you and not participating in giving any instructions? |
| A: | No. |
| Q: | My statement is correct? |
| A: | Yes. |
| Q: | He was letting you do your job? |
| A: | Yes. |

*See* Deposition of Mr. Cheramie, at p. 23, l.18-24; p. 24, l5; p. 47, l. 19-23; pg. 48, l. 13-15; p. 63, l. 4-22.

[16] Mr. Comeaux testified as follows:

| | |
|---|---|
| Q: | OES – when OES contracts with an oil company to run casing, they indicate to the oil company that they know what they're doing in running casing? |
| A: | Yes, sir. |
| Q: | They're not looking at the oil company to tell them how to go about running the casing? |
| A: | No, sir. |
| | *** |
| Q: | Do you know if the W&T company man was on the drill floor? |
| A: | Yes, sir. He was on the side of the driller's panel. |
| Q: | And how far away was that from where you had this discussion with the two Blake people about the strap or the cable? |
| A: | I figure about five or six foot away from us. |
| Q: | He was not – did not take part in the conversation? |
| A: | No, sir. |
| Q: | He didn't tell you to do or not do anything? |
| A: | No, sir. |
| Q: | And he didn't tell – or you didn't hear him say anything to anybody up to the time of accident; correct? |
| A: | No, sir. |

*** 

| | |
|---|---|
| Q: | Who made the decision to use the strap? |
| A: | The Blake employees, Blake personnel. |

*See* Deposition James Bert Comeaux, attached as Exhibit "B" to W&T's motion for summary judgment, at p. 13, l. 2-10; p. 36, l. 18 through p. 37, line 22 (emphasis added)

was rigged up" and "ready to go," and that he was on the rig floor "less than a minute" before the accident happened.[17]

The Court concludes the foregoing dispute of fact is immaterial to the issue of operational control, which has at its heart a requirement that the principal engage in, or reserve to itself, some form of operational control most often illustrated as giving instructions often noted as step by step, to its independent contractor in the performance of the work for the exception to apply.  Here, the precise fact that is disputed is whether Mr. Lewis was or was not present on the rig floor and/or participated in the discussion concerning the strap.  However, although there is dispute as to whether Mr. Lewis was or was not present on the rig floor while the discussion occurred, *no party disputes that Mr. Lewis – even if present – did not direct either OES or Blake in how to conduct their casing and/or drilling operations or whether to use or not use a strap*.  In fact, the testimony of both Mr. Cheramie for Baker and Mr. Comeaux for OES supports W&T's argument, confirming as it does that Mr. Lewis did not direct Blake or the plaintiff in how to perform the re-centering operation.  Thus, even if this Court were to assume that Mr. Lewis were present on the rig floor at the time of the conversation and participated in the conversation, neither the plaintiff nor Blake has put forth any evidence showing Mr. Lewis directed how the casing should be re-centered, which is the activity that was occurring at the time Mr. Cormier was injured, or which piece of equipment should be used to accomplish the work.  Rather, the testimony shows either Blake, acting alone, or Blake and OES, acting in concert, selected the strap to be used.

The fact that Mr. Lewis stated -- <u>after the accident</u> – that the procedure would not be

_____

[17] *See* Deposition of Mark Lewis, attached as Exhibit "D" to plaintiff's opposition brief, Doc. 66, p. 75, l. 2-13.

conducted in the same manner which Blake had originally attempted, does not thereby result in a

conclusion that W&T retained operational control. The foregoing is immaterial, as it occurred after

Mr. Cormier's accident, and relates to safety matters, of which W&T has final say. "[T]he fact that

a principal takes an active interest in the safety of the employees of its independent contractor does

not, in and of itself, constitute direct operational control." *Duplantis v. Shell*, 948 F.2d 187, 193 (5th

Cir. 1991).

### 4.   Express or Implied Authorization of Contractors' Acts

The second prong of the operational control exception is whether the principal expressly or

impliedly authorized its independent contractor's acts. *See Hebert*, 72 F.Supp.2d at 686, *citing*

*Coulter*, 117 F.3d at 912; *Graham*, 21 F.3d at 645; *Ainsworth*, 829 F.2d at 549. The main inquiry

in this case with respect to this factor is the issue of the nylon strap. Mr. Cormier and Blake argue

Mr. Lewis expressly authorized the unsafe work practice that led to Mr. Cormier's injury, *i.e.*, the

use of the 2-inch nylon strap (rather than a chain or stronger strap) to attempt to re-center the casing

string.

The testimony shows Mr. Lewis did not direct the use of a strap, or disallow the use of a

chain, as demonstrated by the deposition testimony of Mr. Cheramie:

Q:     Who brought up the issue about the problem of getting the slips put back in,
       in this meeting?

A:     It wasn't really brought up. I mean we seen it, you know. We discussed how
       we would, what we were going to do to get it back in; so we could continue
       operations.

Q:     Who said what?

A:     I don't remember who said it, but somebody mentioned about a chain. I
       really don't know who it is. But I know I said we would not use a chain due

to the fact that it if creates a spark, we could have well control problems.

Q:     Did the W&T company man say anything while this meeting was going on?

A:     He didn't – he did mention something about chain, but he did not – when I said no about using the chain, he did not argue the point or anything like that, no.

Q:     Did he tell anybody what to do?

A:     No, he did not.

Q:     Who made the decision about using a strap?

A:     I gave them the okay to put the strap on.

Q:     Who did you give the okay to, to put the strap?

A:     To the derrickhand.

Q:     Just so we're clear on this, the W&T man, when this meeting was going on, he wasn't telling anybody anything about how they should go about handling this situation?

A:     It was brought, I was brought up using a strap instead of a chain.  It was agreed upon by OES, the company man, and me to go ahead and use the strap.  It was agreed upon by all.  Nobody had anything to say not to use it.  They all agreed to go ahead and do it, and they assisted on putting the strap on.

Q:     Let me just be clear.  The company man did not direct anybody to do anything?

A:     No.

Q:     You said, "This is how we should do it," and if he said anything, it was okay?

A:     He said it was okay.

Q:     Okay.  Blake is the company that's out there to run the casing; right?

A:      Yes.[18]

Mr. Cormier and Blake attempt to argue that by "participating in the discussion on the rig floor about whether to use a cable/chain or strap and not instructing Blake to use the cable/chain," Mr. Lewis, and W&T, impliedly authorized Blake to engage in an unsafe work practice (use of the 2-inch nylon strap).  At the very least, Mr. Cormier and Blake argue the disputed testimony of Mr. Cheramie and Mr. Lewis creates an issue of material fact that precludes summary judgment on this point.

However, a careful reading of the testimony shows – if one were to assume Mr. Lewis was on the rig floor at the time of the discussion – Mr. Lewis merely *suggested* the use of a chain, which suggestion was not followed by Baker and/or OES.  It is undisputed Mr. Lewis did not pursue the issue of a chain.  The jurisprudence is clear that "[i]t is not enough that [the operator] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, *to make suggestions or recommendations which need not necessarily be followed*, or to prescribe alterations or deviations...."  *LeJeune*, 950 F.2d at 270, *quoting Landry*, 889 F.2d at 1471.  Furthermore, to the extent Mr. Lewis indicated he was "okay" with the use of the strap – either by silence or spoken affirmation – such does not indicate an express or implied authorization of an unsafe practice.  This Court concludes a general agreement by a principal to a plan of action suggested by an independent contractor does not constitute the necessary level of engagement or control or  "step-by-step" directions to an independent contractor to perform work in a certain way contemplated by the application of the exception.

Thus, even if this Court were to assume that Mr. Lewis was present at the time the discussion

---

[18] *See* Deposition of Mr. Cheramie, at pp. 46-48 (emphasis added).

about the possible use of a chain was being held and/or suggested general agreement with the use of the strap, the testimony of both the OES and Baker supervisors confirms that Mr. Lewis's suggestion of a chain was overriden, and Mr. Lewis did not insist that a chain be used, or even press for the use of a chain beyond a mere suggestion.  Given the undisputed facts, this Court cannot conclude that such a suggestion constitutes an implied authorization to engage in an unsafe procedure.  Rather, to find operational control, "there must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way."  *Id.*  Based on the uncontroverted testimony offered here, even if Mr. Lewis made a suggestion to use a chain, that suggestion was not followed by OES, the independent contractor in charge of casing operations, or Blake, the independent contractor in charge of drilling operations.

Therefore, this Court concludes the operational control exception to the independent contractor defense is not applicable in this case.

### D.     Independent Negligence

In his complaint against W&T, Mr. Cormier argues independent negligence on the part of W&T by, *inter alia*, failing "to exercise reasonable care for the safety of all persons involved in the casing operation, including Complainant;" "[n]egligent operation of the platform on South Timbalier 316, its equipment and/or appurtenances at the time of this accident by defendants' agents, employees and/or representatives;" and failing "to adequately train and/or supervise defendants' employees, crews, and/or third parties who were supervising the operation and performance of casing work at the time of the injury to Complainant."  In its motion, W&T argues it did not owe Mr. Cormier a duty and cannot be liable for independent negligence.  Both Mr. Cormier and Blake respond that W&T is liable for its own negligence and that of Mr. Lewis, and there are genuine

issues of material fact regarding whether the actions and/or inactions of Mr. Lewis constitute a breach of the duty owed to Mr. Cormier.

Although the general rule concerning principals and independent contractors shields a principal from the acts of its independent contractor that do not fall within one of the two exceptions explained above, the principal, here W&T, remains liable for its own acts of negligence. *Hebert*, 72 F.Supp.2d at 688, *citing Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir. 1994). Mr. Cormier's complaint concerns the duty, if any, W&T owed to Mr. Cormier. *Id.* In *Hebert*, this Court noted:

> Duty is a question of law. [citation omitted]. In *Crane v. Exxon Corp.*, 613 So.2d 214, 221 at n. 7 (La.Ct.App.1992), the Louisiana court defined the principal's duty by reference to its contract with the independent contractor. The Louisiana court held that, under the contract, the principal had no duty to provide a safe work place to the independent contractor's employees. Id. ... In the instant case, [the principal's] duties were expressly delineated in its contract with [the independent contractor].

*Hebert*, 72 F.Supp.2d at 686, *citing Graham*, 21 F.3d at 647.

Moreover, in *Ainsworth*, the Fifth Circuit stated that "Louisiana law will not support the imposition of liability upon [the principal] for failure to intercede in [the independent contractor's] decision to work without lights." 829 F.2d at 551. W&T argues, and this Court agrees, that Louisiana law does not support imposition of liability upon W&T for failure to intercede in the work procedures of OES or Baker. Accordingly, no basis for establishing a legal duty of W&T to Mr. Cormier exists. Because Mr. Cormier and Blake have failed to establish that W&T owed Mr. Cormier a legal duty, Mr. Cormier has failed to prove an element of his claim against W&T for its own alleged acts of negligence.

Blake's argument that a duty on the part of W&T was created when W&T assumed control and responsibility for the safety of the operations is not persuasive. Specifically, Blake argues it was

-28-

obligated to comply with W&T's requests and safety instructions, and Mr. Lewis had authority to step in and prevent unsafe situations. Blake cites the case of *Ballew v. Texaco, Inc.*, 1995 WL 638595 (E.D. La. Oct. 27, 1995) (J. Clement) in support of its position. This Court concludes reliance on the *Ballew* case is misplaced.

In *Ballew*, the question was whether Texaco, the principal and platform owner, could be liable for the injuries of the plaintiff, an employee of Texaco's independent contractor, Dual Drilling Company. The plaintiff was injured after tripping on a chain on the deck of an offshore drilling platform. After Texaco filed a motion for summary judgment seeking dismissal of the plaintiff's claims against it, a Dual employee who was on the rig at the time of the accident testified by affidavit that he was the one who gave plaintiff the order to retrieve a sledge hammer, which led the plaintiff to descend the stairs on which he tripped. The Dual employee also stated the chain on which plaintiff tripped was owned by Dual Drilling Co.; the Texaco company man on the rig did not give any instructions to plaintiff at the time of the accident; and, to the best of his knowledge, the company man did not place the chain or any foreign substances on the stairs, nor did he directly supervise the plaintiff or exercise operational control over his activities at the time of his accident. Texaco's company man on the rig similarly testified by affidavit that he did not give any instructions to plaintiff at the time of the accident, including an instruction to traverse the stairs, and he never directly supervised plaintiff or exercised operational control over his activities at the time of the accident. By deposition, the company man testified his job on the rig was to ensure the rig mobilization stayed within Texaco's guidelines, track the deadline, and monitor the progress of the job. He further testified if Dual did not comply with the specifications set out by Texaco, and if something was being done unsafely, he had the authority to stop the operation. *Ballew*, 1995 WL

638595, *2.

In response, the plaintiff filed an affidavit in which he attested he attended a safety meeting at which the company man gave directions regarding the safety conditions on the rig and platform, both generally and as to specific conditions and actions; he understood he was to follow orders of the company man and was there to serve the company man first; and he witnessed the company man giving directions and orders to various people on the platform and rig. The plaintiff also testified he recalled the company man directing his supervisor to clean up particular areas of the deck or drill floor that he felt were unkempt or not in accordance with the safety specs; the company man directed the supervisor to move or rearrange certain sections of pipe that were laid on the deck and drill floor; and he heard Texaco company man direct not only the supervisor, but also particular workers, to perform specific tasks, including directions to clean up specific sites on the platform and rig. *Id.* at *2.

Denying Texaco's motion for summary judgment, the district court held the plaintiff's affidavit created a genuine issue of fact as to whether Texaco either retained operational control over the drilling activities or assumed a duty of providing for the safety of Dual employees. Furthermore, with respect to plaintiff's claim of direct negligence by Texaco, the district court held plaintiff's affidavit raised an issue of fact as to whether Texaco voluntarily assumed the duty of protecting its contractor's employees. *Id.* at *3.

Blake attempts to analogize the facts of the instant case to those in *Ballew*, arguing there can be liability on the part of the principal – or, at least, summary judgement should not be granted under such circumstances – even where the company man does not give instructions to the plaintiff at the time of the accident. This Court concludes the *Ballew* case is inapposite.

First, this Court notes it is not bound by the decisions of other district courts, therefore, the *Ballew* decision has no precedential value over this Court.  Second, this Court concludes the *Ballew* case is not analogous to the instant case.  In *Ballew*, the plaintiff submitted an affidavit detailing several precise directions given by the Texaco company man not only to plaintiff's supervisor, but to others onboard the platform as well, including directions regarding the safety conditions on the rig and platform, both generally and as to specific conditions and actions.  In *Ballew*, the plaintiff testified he understood he was to follow all orders of the Texaco company man, raising questions as to who actually supervised the plaintiff.  The plaintiff also detailed instances in which he had seen the Texaco company man directing the plaintiff's supervisor to clean up particular areas of the deck or drill floor that he felt were unkempt or not in accordance with the safety specs and directing the supervisor to move or rearrange certain sections of pipe that were laid on the deck and drill floor.  Finally, the plaintiff attested he heard the Texaco company man direct not only the supervisor, but also particular workers, to perform specific tasks, including directions to clean up specific sites on the platform and rig.  *Id.* at *2.

In the instant case, this Court is aware of no testimony from Mr. Cormier or Blake establishing a similar factual scenario as the one described in *Ballew*.  There has been no evidence put forth by either Mr. Cormier or Blake to show that Mr. Lewis gave similar detailed instructions, to either Mr. Cormier or other employees of OES and/or Baker, in the manner suggested in *Ballew*.  In fact, Mr. Cormier testified at his deposition that Mr. Lewis did not give him *any* instructions of *any* kind prior to the time that he was injured.[19]

---

[19] Nor can W&T be found liable, as a matter of law, for supplying defective equipment (*i.e.*, the strap).  Pursuant to the express language of the Drilling Contract between W&T and Blake, Blake provided all equipment it used, and it has been established W&T did not owe a duty to Mr. Cormier to intervene in Blake's decision to use the

Considering the foregoing, this Court concludes there are no genuine issues of material fact as to whether W&T is liable to Mr. Cormier for the negligence of its independent contractors, OES and Baker, or for its own alleged acts of negligence, and W&T's motion for summary judgment should be GRANTED.

## III.   Conclusion

For the foregoing reasons,

IT IS ORDERED that the Motion for Summary Judgment filed by W&T Offshore, Inc. ("W&T") [Doc. 64] is GRANTED, and all claims asserted by the plaintiff in his Complaint and First Supplemental and Amending Complaint against W&T, as well as the Complaint of Intervention of the intervenor, Liberty Mutual Insurance Company ("Liberty Mutual"), against W&T, are DENIED AND DISMISSED WITH PREJUDICE.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____11_____ day of April, 2013.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

strap.

This Court declines to engage in a lengthy discussion of W&T's final argument, that Mr. Cormier has attempted to "create" a legal duty to ensure that all operations are conducted in a safe and workmanlike fashion and to ensure that all equipment is in a safe condition by offering an expert report containing the foregoing opinion. As Mr. Cormier argues in his opposition brief, his expert is not attempting to "create" a legal duty, but rather, has offered an expert opinion regarding whether or not the actions of W&T constitute a breach of an already-existing legal duty. Because this Court has concluded W&T did not owe Mr. Cormier an independent legal duty under the circumstances of this case, this Court need not further discuss Mr. Cormier's argument that there was a breach, as Mr. Cormier cannot establish a claim of negligence against W&T without satisfying the existence of a duty factor.